## PRELIMINARY STATEMENT

This Memorandum of Law in Support of the Opposition to the Motion for Sanctions and the Cross Motion for Sanctions against Defendants' attorneys presents the following, unfortunately, *all too common* situation.  Attorneys *falsely state* that they are utilizing requests for sanctions with the *stated goal* of ensuring that an opposing attorney is not permitted to violate his obligation to the Court under Fed. R. Civ. P. 11 to ensure that every factual contention in his client's complaint was likely to have evidentiary support, when their *true and primary goal* is to (via a contrived reason based upon by allegations they make in papers submitted to a court which they know are untrue at the time they make them) *drive a wedge between the attorney and his client* in order to force the attorney, unwilling to risk any potential damage to his own financial interests and reputation, to abandon his client and her valid cause of action.  It should be noted that, in the instant case, the Defendants and their six or so attorneys' *true and secondary goal* is to draw the Plaintiff's and its single attorney's *extremely limited resources* away from what should be the Plaintiff's primary objective, that is, to defend against the Defendants' Motion to Dismiss. Going forward, we expect that Defendants and their attorneys will file as many creative yet frivolous motions as they estimate that this Court will tolerate.

## STATEMENT OF FACTS AND ARGUMENT

In the instant matter, the first time the issue of sanctions was broached by the Defendants was just after midnight on January 18, 2018 when, after notifying Defendants' lead attorney Andrew Levander at 10:26 pm the night of January 17, 2018 that I would be amending the Complaint to add Gerson Zweifach as a Defendant, I inquired, since Mr. Levander had previously notified me that he would be representing all Defendants (by then he had accepted service of all Defendants – whether he expected that he would also represent Mr. Zweifach.  Two hours later, at

12:29 am on January 18, 2018 I received Mr. Levander's response: "We will certainly be representing Mr. Zweifach.  Frankly, I cannot fathom what, consistent with Rule 11, would be your basis to sue him but why don't you send me your draft complaint without prejudice so I can advise him about accepting service".  I have to assume that the reason he brought up the issue of sanctions might have something to do with the fact that I was threatening – they likely viewed it as a threat, which might be dissuaded by a cross threat, but I viewed it as a notification and promise – to sue Gerson Zweifach, who as a lawyer understands the utility of a request for sanctions.

I considered the thinly veiled threat and quickly determined that Mr. Levander had no valid basis to make good on that threat which could even conceivably have a chance of passing the "red face test", since Gerson Zweifach was a figure central to the action.  Thus, in an ultimately futile attempt to avoid having to waste any more precious time considering the potential validity of any further baseless threats by Defendants' attorneys, I responded to him on January 18, 2018 at 10:13 am that I would not be sending him the Amended Complaint and that I would just file it.  He ultimately accepted service on behalf of Mr. Zweifach.

Subsequently, I received a telephone call from Linda Goldstein (her associate, Brian Raphael, was there as well, but please note that I am not requesting sanctions against him, nor am I requesting sanctions against Nicole Jacoby, who is a partner at Defendant's attorneys law firm also involved in this action, but who I don't believe was involved in the decision to make a frivolous motion for sanctions against me), threatening me with sanctions.  Evidently, by then Mr. Levander and Ms. Goldstein had made the same calculation as I had (that Mr. Levander had no conceivably valid basis to make good on that initial threat made by email without courting sanctions himself).  The decision to request sanctions had already been determined, regardless, so they *had to come up with another contrived reason* for requesting that this Court grant sanctions

against me, that is, a contrived reason that required the Court to weigh the credibility of their statement and the Defendants' allies' statement against the credibility of my statement and my client's statement.  She referenced in that call her position that I knew that the "republication" allegation made in the Amended Complaint was false because PressReader – or rather, PressReader's legal counsel, "confirmed" it was false.  I told her that I simply did not believe PressReader's legal counsel and that I would not be retracting anything.  I didn't take seriously Ms. Goldstein's contention that I am required to simply believe the in-house legal counsel of a potential defendant in an action when he simply says, with no evidence to back up his statement, that they "didn't do it".  I have yet to run into the potential defendant who is willing to simply admit that he did what I allege he did.

In their papers, Defendants' attorney Ms. Goldstein, makes the allegation that "Mr. Sanchez signed and filed these pleadings despite his actual knowledge that the republication allegations were false".  *Yet this very same allegation made by Ms. Goldstein constitutes the first of many false allegations she makes in her papers, which she signed and filed, despite her actual knowledge that the allegations were false.*  She made this allegation even after I informed her, honestly, that I did not believe the republication allegations were false, and that if she did move for sanctions against me for that bogus reason, I would cross move for sanctions against her.

As I recall the conversation, Ms. Goldstein first attempted to intimidate me, by referencing sanctions which had been sought and awarded against me in an entirely unrelated matter, *Levitt v. Charles*, and I seem to recall her doing so with a seemingly good-natured chuckle.  I believe I recall her referencing the fact that she had never been sanctioned and, to that I replied, "Not yet!".  It seemed to me at the time, given a certain hesitation in her voice, that that statement made an impression on her, and although I couldn't see her face so I couldn't be sure of how she took that

reply, I distinctly remember that she didn't seem to feel that was worth a seemingly good-natured chuckle.

On page 5 of her papers, Ms. Goldstein says that I 'refused to provide any basis for discrediting PressReaders statement'.  Well, at that time of the telephone call, I hadn't had the benefit of the time to prepare for the telephone call, and I really didn't know when I picked up the telephone that the issue of sanctions would come up on that telephone call with regard to the letters from PressReader, so I just responded as best as I could under the circumstances.  Quite frankly, I find it hilarious that she could have the face to attempt to depict an informal telephone call (which I received in my bedroom while I was in my pajamas, without even my file available to me) and my inability to immediately produce at her request some sort of bullet point spreadsheet, with a series of cogent arguments as to why I don't believe the in-house counsel at PressReader, as some sort of evidence of my lack of 'any colorable basis' for my 'allegations that a republication had occurred'.  What is also quite funny is that I remember her, seemingly unconcerned, first saying something to the effect that I 'didn't have to talk about this now', but *then she began to talk about it now*, and obviously had prepared for that call, turning what she pretended to be an informal call into some sort of cross examination. I also do find kind of humorous her feigned indignation at having to force me, to 'implore' me, to provide her information as to why I don't believe the word of a party she *knowingly falsely* depicts as a 'neutral third party'.  She knows that PressReader is not 'a neutral third party', unless she defines the term 'neutral third party' as someone I haven't added as a Defendant *yet*.  As far as I can understand PressReader's business model, the Defendants are both *a very significant Supplier* and *a very significant Customer* of PressReader.  Considering that encompasses *not 1 but 2 of the 5 forces* discussed in Harvard Business School Professor Michael Porter's five forces of business competition model, 'Bargaining Power of Suppliers', as

well as 'Bargaining Power of Customers', that is a whole lot of bargaining power that the Defendants have against PressReader, and when one adds to that the fact that I informed them in writing I would probably sue them along with the other Defendants, I find it hard to see how they could be considered a 'neutral third party'.  I didn't sue them because I believe they are innocent. I didn't sue them solely because *I can't sue everybody* given my limited resources, and that decision may change down the line given what I have determined during the preparation of these papers.

In footnote 2 of page 2 she notes that PressReader has about 7,000 Partners around the world.  How many of those "Partners" are something one could hardly call a newspaper – I have to assume that there are only a small handful of 'Partners' which are such significant Suppliers and Customers as the Defendants.  What does this Court think would happen to PressReader, and Mr. Malyarov's stock options, if it lost the Defendants as Customers and Suppliers? There is nothing approaching "neutral third party" status in the relationship between PressReader and the Defendants, and PressReader would say or do almost anything that the Defendants would want them to say or do, especially if it might ward off a threatened litigation against PressReader itself. So, no, I don't believe them, because I am not a fool, and I will present some of the other reasons why below.

I do, however, believe my client when she told me that she had never seen that article on PressReader and that it must have been republished, coincidentally enough around the time she and her sister were providing information to the regulatory authorities in the U.K. about the Murdoch's bid for Sky News, a several billion dollar deal, with a break-up fee of 400 million if it didn't go through, and when it was entirely in the Defendants' interest to have anyone at the U.K. regulator who did a simple Google search of her name question her credibility. I believe her

because I heard the shock, anger and fear in her voice when I told her what I had seen with just a quick Google search of her name, because I know how people sound when they are shocked, angry and afraid, and because Petra Beter may have been a model several years ago, but was never to my knowledge an Academy Award winning actress.  Moreover, because, as Ms. Goldstein states in her paper on page 7 in her attempt to discredit her, Petra Beter had a lot of attorneys before me – Ms. Goldstein says the number is 12.  Does this Court actually believe that each of those attorneys did not each separately do a Google search on Petra and would have told her if they had found what I found?  My client and her sister were completely preoccupied with that story, have thought of almost nothing but that story in the past 6 years, attempting to stamp it out wherever it reared its ugly head for those 6 years, hiring attorneys to help them, and scouring the internet for any traces.  They believed that they finally had stamped out any traces of that article.  Until, of course, I did a simple Google search and found what I found.  The Defendants were likely aware of what my client was doing in the U.K. with the regulator, and the Defendants have demonstrated to me a pattern of seeking to discredit my client and her sister, so that no one would believe them and so that they would be *isolated from any potential assistance against Defendants*.  As a matter of fact, *that is the first thing they tried to do with me* when I spoke to them on the telephone about this matter, as discussed below, and that is what they are trying to do with the Court in this motion by bringing up the various litigations, the bankruptcy case, etc. that are set forth from page 6 to page 7 of Defendants' papers.

Allow me to address at this juncture just one of those points, raised on page 7, regarding this fellow, Anthony Ostlund, a lawyer for News Corp who they had then hired to handle a threatened  future litigation.  Now, it is plausible that one might hire a firm in a different state than your own before the litigation actually starts, and before you even know where the matter will be

filed, but why did they not inform the Plaintiff's sister, Josee Beter, that they had been retained by News Corp when they first spoke to her on the telephone, especially if they knew she had an attorney? Why did they invite her to come in to meet with them so that they could deliver that news in person? Is it not plausible that one might do this because intimidation works best, and is known to be more effective *with a woman who is already fearful* because of her run-ins with some pretty influential men, when the intimidation is in person, in a room, with the door closed, where *that woman is set before an intellectually or physically intimidating male figure and feels trapped*. Under such circumstances, one needn't even say anything intimidating, as the circumstances alone result in the desired effect. I am not a woman, but this is what women have told me is the effect of similar circumstances, and I believe them. She informs me that when he looked at her and told her he was representing them, she felt an overwhelming sense of fear – she felt that they had, ultimately, followed her to her hometown, her 'safe place', and now had her in a closed room. *This is News Corp, one of the most powerful companies in the world, owned by one of the most powerful men in the world, sending their emissaries to her town and somehow getting her alone in a room, and she is just a young woman with a sister and an elderly widowed mother.* She informs me her attorney was livid when he was informed, but what could he do then since they had presented him with a *fait accompli*, and the other side could always claim, 'honest mistake, sorry', precisely as they attempt to do in their papers. But, as Ms. Goldstein also notes in connection with Mr. Ostlund, Plaintiff had threatened the litigation against them '(but did not file)', so my only question for Mr. Ostlund at a deposition would be whether he received payment based on his hourlies, or a well-earned success fee.

Now, with regard to her various litigations which may not have gone anywhere, and the bankruptcy, who are the Defendants and their attorneys to so smugly judge the Plaintiff and her

family?  Some of the Defendants are connected to a phone hacking scandal in the U.K., and on April 10, 2018, the European Commission raided the London offices of Rupert Murdoch's Fox network as part of a competition probe into the market for sports rights as to whether they violated EU antitrust rules that prohibit cartels and restrictive business practices.  As far as I am aware, no one has raided my client's home. Why should Ms. Goldstein be able to give her clients the benefit of the doubt after the phone hacking scandal and the raid?  Moreover, the Defendants are engaged in all sorts of litigations all over the world.  Is the fact that the Plaintiff's litigations went nowhere, whereas the Defendants' litigations go wherever they want them to go, entirely due to the respective merits of each of the litigations, or might the ability to pay a lot of very good lawyers count for something?

It is significant for the Court to understand that one of the reasons I refused to give in to Ms. Goldstein's threats had to do with my very first conversation with Ms. Goldstein relating to the instant matter.  I had sent the soon to be Defendants a letter on September 18, 2017 – letter without exhibits attached as Goldstein Decl. Ex. 2 at B - , and when we spoke on the telephone regarding the letter, she informed me that my clients had been attempting to litigate the facts underlying this matter for some time with other lawyers (which I knew) and that there had been 'a judicial determination' (which I didn't know).  I asked her to send me that judicial determination, which she, by linking the term 'a judicial determination' to the term 'attempting to litigate the matter for some time with other lawyers' led me to believe that the 'judicial determination' was connected to the matter referenced in the letter I had sent her.  However, when I asked her for more details and to send me the judicial determination, she initially demurred, concerned, given my client and her sister's history of standing up for themselves as best they can under the circumstances (although I believe she used a term along the lines of the term normally utilized by

powerful entities when persons with limited resources and outclassed, outnumbered and outflanked attorneys stand up for themselves, 'filing or threatening to file frivolous lawsuits"), that she was concerned that she might become a target of a lawsuit herself.

I responded to her something to the effect that, given my limited resources[1], I would be unlikely to easily locate the so called 'judicial determination' unless I could find it on a simple Google search.

Subsequently (it could have been the next day or a few days after) she sent me something, but expecting to see a judicial determination related to the matter, all I can recall receiving was some bankruptcy case that I could barely make sense of (I am not a bankruptcy attorney, and at our firm of one, we don't presently have a bankruptcy specialist working for us), and some type of complaint of some sort where a lawyer of my client's sister, Josee, had sued a boyfriend under a somewhat novel argument regarding his promises to her.

After receiving and considering these documents, especially that complaint, I was both angry (at Linda Goldstein for what I considered to be an attempt to mislead me about "a judicial determination"), pleased with myself by not giving her the benefit of the doubt and/or credibility that I realized now she did not deserve, and, quite frankly, realizing what she had tried to do by sending that complaint to me I felt a little sick to my stomach (along lines similar to how I felt when I first read the transcript and listened to the taped conversation between Josh Margolin and Petra Beter and read her distressed text messages to Josh Margolin – I felt like I had been a witness to something that was just, well, dirty, or ugly or even evil).

---

[1] I can only access Westlaw or Lexis Nexis via the Supreme Court library, and although I have a service called Fastcase which is pretty good, which only costs me about $100 per month, service as you might imagine is spotty, especially when Fastcase attempts to automatically access my account and finds it wanting of funds since Fastcase, unlike me, only works when it is getting paid.

As a matter of fact, as I write this and try without much success to put into words my initial impression when I received these documents, because it is kind of hard to express accurately in words, I realize that what I felt was something similar to what I felt during one of the key incidents leading to my bringing the case for which I was ultimately sanctioned by Judge Englemayer, *Charles v. Levitt*, which Linda Goldstein references in her papers.  In that incident, I was ushered into a private backroom with the other attorneys and a New York State Supreme Court Judge's Clerk, and at some point the Judge's Clerk referenced something about a position for me resulting from the Receivership that the other attorneys were trying to force on my client's $3 Million Home in Harlem if only I could get my client to more easily agree to the Receivership, and then the Judge's Clerk told me, "You could make money on this".  To this I replied, "I don't see how my client could make money on this", to which the Judge's Clerk looked at me, smiled, and said, "No, YOU could make money on this".  I remember feeling both angry, and somewhat dirty and/or sick to my stomach, so I let her know that I had an issue with what she was recommending, that I should betray my client for my own financial benefit, and when I did that she suddenly seemed to get angry or nervous and she asked one of the other attorneys in the room, the one from the bank, whose computer was open, whether or not he was taping, and he replied that he wasn't. Subsequently, outside the courtroom I asked the other attorneys if they had heard what she said, and they each looked very uncomfortable, and admitted that they had (after all, it is not easy to lie straight to someone's face when they and other people present were also witnesses to the same thing occurring just a few minutes ago – one requires at least some time to get their story straight with the other guy) but one of them made up some lame excuse for why she might have made that comment, and the other attorney immediately agreed that that had to be the reason why she said that to me.

Subsequently, in their papers requesting sanctions against me, the attorneys (one or both, I can't recall who filed an affirmation in the case) *denied having heard* the Judge's Clerk make that statement but noted that, if she had, she did it *for the same lame excuse* they had both agreed upon that day outside the courtroom.

Thus, given that same feeling of anger, and sickness in my stomach, that I felt after getting those papers from Linda Goldstein, I had the same reaction that I did in the instant case - I immediately determined to sue the Defendants in Federal Court.

Unfortunately for me, the papers submitted to Judge Englemayer requesting sanctions were far better than the Defendant's papers, and contained some basis in the law when connected to the facts (if one was to believe their version of the facts over mine, and it was my word against theirs, and there were two of them, and the Judges Clerk, who was also a Defendant).

Moreover, as I argued my appeal in the case, one of the Judges on the panel asked me whether or not I felt Judge Englemayer had abused his discretion in awarding sanctions against me, and given my understanding that a Judge has a great deal of discretion when awarding sanctions, I thought about it for a second and found it necessary to honestly admit, "No." So, they awarded sanctions against me, and on the day they did I got a call from the New York Law Journal requesting my comment. The very next day an article came out in the front page of the New York Law Journal about the sanctions awarded against me.

In that article opposing counsel commented:

"In a statement, he said he and his clients were pleased and gratified with the panel's decision.

'This case was a desperate, impermissible attack on a state court judgment in the federal courts. While no attorney wants to see another sanctioned, here sanctions were more than appropriate given the outrageous, baseless claims asserted in the amended complaint against well-respected attorneys and members of the judiciary and the numerous chances counsel had to withdraw them,' Dawson said."

What is interesting about this statement is that, although sanctions had been awarded against me, my client had ultimately ended up in a far better place than he would have been if I had given in to the threats, which I immediately realized and acknowledged in my statement to the New York Law Journal, but opposing counsel seemed to have completely failed to realize, given their joy at having succeeded in getting sanctions awarded against me.

As the article continues,

'In a statement, Sanchez-Dorta said he respectfully disagreed with the court's decision, *in part*, and is considering his options.' (emphasis added)

'However, the panel noted precedent that states that, where a court lacks subject matter jurisdiction, it also lacks the power to dismiss with prejudice. The case was remanded back to Englemayer to have the judgment entered without prejudice.'

Thus, the result illustrated the validity of what I had discussed in my papers as my reasons for not withdrawing my complaint –an attorney should not sacrifice his client's interest for his interest by withdrawing what he in good faith considers to be a valid legal argument under pressure of a threat designed to divide him from his client (the equivalent of the Judge's clerk statement to me behind closed doors that 'You could *make money* on this' *if you are willing to betray your client* is opposing counsel's statement 'You can *avoid losing money* on this" *if you are willing to abandon your client*).

Thus, opposing counsel's joy at having gotten sanctions against someone who they had considered a "Traitor" to them and other attorneys was short lived – but what was fascinating was that *they actually thought they had won*, simply by getting sanctions awarded against me, when *my client was now permitted to restart his action in state court, which he wouldn't have been able to do if I had given in to opposing counsel's pressure* – and as far as I am aware, they still haven't succeeded in selling his Home in Harlem and monetizing the proceeds of what I consider to be their fraud.

Unfortunately, I didn't completely understand the import of the Rooker-Feldman Doctrine since that was the first time I had ever heard of that doctrine – as I explain further below, I have spent a lot of time out of the country, and a lot of that time not practicing law. I do however, have an extremely good handle on what makes someone credible or not credible, because I have seen a lot and done a lot, both on and off the beaten path, in diverse areas of the world, and have dealt with all types of people.

Thus, although opposing counsel in that case, and opposing counsel in the instant case, might consider those sanctions a stain on my record, I am forced, for the reasons discussed above and below, to consider them a bit of a "red badge of courage" that I really would have preferred never to have had to wear, and which will unfortunately follow me around forever, allowing persons like Ms. Goldstein to make the kinds of statements she makes about me in her papers.

Moreover, I am sure that Judge Englemayer would also have preferred not to have a case remanded on such an apparently rookie error, so it seems that all parties involved lost a little, and all parties won a little, from the appeal. But, given the circumstances, I would not do a single thing differently, because I am always happy to lose a little skin and blood, if I am able to, eventually, take a little skin and blood from the other guy.

And that brings us to my final point regarding statements Linda Goldstein makes in her papers which *she knew were false when she made them*. Ms. Goldstein again knowingly misrepresents my statements to her in our telephone call, when she states that I am 'philosophically opposed to Rule 11'. Now, that is extremely selective editing of my statement to her. I am not 'philosophically opposed to Rule 11'. I am no legal anarchist. I believe an attorney should be *severely punished* if he/she knowingly puts something in their papers which they know to be a lie.

13

If I were "philosophically opposed to Rule 11', I wouldn't be seeking sanctions against opposing counsel.

I remember telling Ms. Goldstein, taking the time to think and to carefully explain to her that I was philosophically opposed to the use of sanctions to intimidate an attorney into abandoning a client and potentially valid claim which in good faith the attorney believes is valid, and I explained the reason why, which I again provide in more detail about below.

The threat of sanctions against attorneys who legitimately believe in the legal case of their clients, all in a transparent effort to thwart the representation of those whose position the threatening party takes issue with, has a long and sad history.  It is a little known fact that as part of due process during the Inquisition of the Middle Ages, "the accused has the right to employ counsel, and that a denial of this justifies an appeal[2]" (at least, I did not know this until I read this and was shocked when I did).  Nevertheless, the rules of the Inquisition of the Middle Ages also provided that "advocates who excuse and defend heretics are to be held guilty of fautorship of heresy – a crime which became heresy itself if satisfaction at the discretion of the inquisitor was not rendered within a twelvemonth.  When we add to this the perpetually reiterated commands to the inquisitors to proceed without regard to legal forms or the wrangling of advocates, and the notice to notaries that he who drew up the revocation of a confession was excommunicated as an impeder of the Inquisition, it will be readily seen that there was no need for formally refusing counsel to the accused…"[3].

I believe that threats of sanctions against an attorney who legitimately believes in the legal case of his client is not only wrong from a public policy perspective but may, in fact, raise

---

[2] The Inquisition of the Middle Ages, by Henry Charles Lee, An Abridgment by Margaret Nicholson, The Macmillan Company, 1961, page 212.
[3] The Inquisition of the Middle Ages, pgs. 211-212.

constitutional issues.   A number of the amendments of the Bill of Rights can be viewed as responses to abuses common during the Inquisition – the Fifth Amendment, the Seventh Amendment, the Eighth Amendment and even the First Amendment, and in a sense our country was ultimately founded on principles which directly reject the principles of the Inquisition.   The history of the abuses of the Inquisition provides some instruction as to what we should not do.   We should not force people to change their religion, or even have any religion at all if they don't want to.   We should not torture people to get a confession.   We should give people a jury trial in certain cases.   We should not subject people to cruel and inhuman punishment.   And I believe that we should not provide someone a *de jure* right to counsel of his or her choice, pursuant to the Sixth Amendment, and then allow some person who doesn't agree with that person's legal stance to so easily intimidate that person's lawyer so that, *de facto,* his or her right to counsel of his or her choice is practically an empty right, as it was during the Inquisition.

According to the book The Third Reich in Power,

'On 6 July 1933 Hitler gathered leading Nazis together for a stock-taking of the general situation. The National Socialists' revolution had succeeded, he told them: power was theirs, and theirs alone. It was now, he said, time to stabilize the regime.'[4]

In order to accomplish this, the Nazis made some of the following changes, among others:

'Strict regulations were issued about who was entitled to place people in protective custody, and what procedures were to be observed in doing so. An indication of what had been the practice to date was provided by the prohibitions contained in the consolidated regulations issued in April 1934: *no one was to be taken into protective custody for*[5] *personal reasons such as slander, or because they had dismissed employees, or acted as legal representatives of people subsequently imprisoned, or had brought an objectionable legal action before the courts.*[6]

---

[4] Evans, Richard J.. The Third Reich in Power (Kindle Locations 417-418). Penguin Publishing Group. Kindle Edition.
[5] Evans, Richard J.. The Third Reich in Power (Kindle Locations 442-447). Penguin Publishing Group. Kindle Edition.'
[6] Evans, Richard J.. The Third Reich in Power (Kindle Locations 447-448). Penguin Publishing Group. Kindle Edition.

So, at some point it would seem that *even the Nazis* recognized *the concept* that it was abusive to punish someone for representing another, or for bringing an objectionable legal action. Granted, of course, the punishment, protective custody, cannot compare to mere financial sanctions. But, quite frankly, I was shocked to learn that they would have even considered scaling back policies which had effectively chilled the legal defense of another person by subjecting the representative to certain risks. It demonstrates that one thing that many different types of people, across history and under diverse regimes can agree upon, is that there is something fundamentally dangerous about punishing people for their defense of others, and although it might just be necessary in certain cases for certain reasons, we have to be very careful when we decide to do so.

For a number of reasons, I take the subject of the Inquisition far more seriously than most people might regarding an institution which was supposedly abandoned during the 1800's. Many of my ancestors, on both my mother's side and my father's side, were Sephardic Jews, expelled from Spain, who fled to Portugal, where they were forcibly converted to Catholicism, at which point they became subject to the jurisdiction of the Inquisition (the Inquisition had no jurisdiction over Jews who had not converted, but only over Jews who had converted to Catholicism and were then called New Christians, which persons could be convicted by the Inquisition for things like heresy, bigamy, and judaizing). There are quite a lot of people like me, and the accepted term for these people is Bnei Anusim, which can be translated as 'Children (descendants) of the Forced Ones', or "Children (descendants) of the Raped Ones".

The records of the Inquisition kept in the Torre do Tombo National Arquives in Lisbon are full of the trials of my ancestors, some of whom were burned at the stake. As a person who subscribes to some of the tenets of Jewish mysticism, I take the Inquisition very seriously, as well as my connection to my ancestors (the Jewish ones as well as the Taino and African ones) as I very

much believe in what some people like me identify as the "Calling of the Blood".  It may difficult for others to comprehend but for us it is very real.

A couple of years ago I actually gave a talk at Netanya College in Israel entitled, "Jewish Pirates and Lawyers and their Fight Against the Inquisition", which had a not so serious title, involving subject matter that is dead serious for me and people like me.  It's available on Youtube if you are interested, and that video will demonstrate to you how serious the issue is for me.  Many of ancestors, and I have done a lot of research about them, have used both their brains and their brawn to resist the Inquisition and other abusive institutions since.  Some of these have paid for it with their freedom, their livelihood and, in some cases, their lives.  Others have been far less noble, and although I recognize those, I consider them to instruct myself as to what not to do.

Thus, for me to back down based upon a frivolous Rule 11 motion, that was served upon me as part of a transparent strategy typically used by persons like the Defendants and their attorneys to silence valid complaints by intimidating a person's attorney (as occurred during the Inquisition), for me would be tantamount to renouncing a significant part of what I believe and stand for.  I don't care that much about what the people who read the New York Law Journal think about me.  I care about what my ancestors think about me, and what my descendants will think of me if and when they look me up as I look up my ancestors' inquisition records, read the New York Law Journal article regarding the sanctions against me, and read the actual papers in that case. I expect my descendants will read my papers, may very well have a hard time understanding the 'labyrinthian prolixity of unrelated and vituperative charges that defy comprehension', but will understand what I tried to do.   I have often considered that, although Jesus definitely lost his trial, he without a doubt came out looking a lot better over time than the fellows who might have considered themselves the winners of that particular trial.

Unfortunately for Defendants, attempts to intimidate me don't really work, as my skin has over time become somewhat thickened because of those things I was busy doing at the very same time Defendants' attorneys were busy honing their advocacy skills. For instance, I have to ask myself, what can Defendants' attorneys do to me - paper me to death? sanction me to death? seemingly good-natured chuckle me to death?

As to Ms. Goldstein's allegations that the Defendants have no control over PressReader, and that I should just take Nikolay Malyarov's word, consider for a moment this fellow's bio I found from some conference he was involved in:

**"Biography**
Since 2003, Nikolay Malyarov has lead the *expansion* of PressReader's worldwide community of *publishing partners, helping them grow their audience and increase revenues, while meeting their unique business objectives.*
At the forefront of pioneering publishing solutions, Nikolay was instrumental in establishing PressReader as the *only global all-you-can-read digital content platform with a growing list of over 4,000 newspapers and magazines.* Offering multiple presentation formats that serve the needs of traditional replica readers and today's new generation of news consumers, PressReader reaches more than 250 million readers through its vast number of consumer-centric channels that include thousands of hotels, libraries, airlines, cruise ships and cafés. Under Nikolay's leadership, PressReader has also become the trusted technology that *powers 2,000+ of the world's most prestigious brands,* including The New York Times, The Globe and Mail, The Guardian and The Times.
....
*As General Counsel, he is also responsible for all legal aspects of the Company's business.*
**About PressReader**
PressReader is *the global leader in multi-channel, cross-platform content distribution and monetisation, and the chosen partner of more than 4,000 publishers from over 100 countries.* PressReader connects local, national and international magazine and newspaper publishers with readers around the globe and across all platforms …, *providing publishers with new revenue opportunities and increased global circulation.* PressReader technology, a fully customisable digital publishing solution, *helps publishers of all sizes and media types digitise and monetise their content on all devices and platforms.*" – emphasis added –

Harvard Business School Professor Michael Porter's Five Forces Framework discusses, among the five forces used as a tool for analyzing competition in business, the following two forces:

'**Bargaining power of customers**
The bargaining power of customers is also described as the market of outputs: the ability of customers to put the firm under pressure…

'**Bargaining power of suppliers**
The bargaining power of suppliers is also described as the market of inputs. Suppliers of raw materials, components, labor, and services (such as expertise) to the firm can be a source of power over the firm when there are few substitutes. If you are making biscuits and there is only one person who sells flour, you have no alternative but to buy it from them. Suppliers may refuse to work with the firm or charge excessively high prices for unique resources.'

The Defendants here, according to what I can understand by this fellows biography and explanation of PressReader's business model, are not only Customers, and not only Suppliers, *but are both Customers and Suppliers to PressReader.*  And they are not insignificant customers and suppliers – PressReader may deal with 4,000 plus customers and suppliers, but how many of the names of those 4,000 will one recognize as well as one recognizes the name, "The New York Post" or, for that matter, all the other papers owned by the Murdochs and Fox, and related parties, like the Wall Street Journal?  Mr. Malyarov is charged with ensuring that The New York Post remains both a Supplier and a Customer, and he is '*also responsible for all legal aspects of the Company's business*", and Linda Goldstein expects me to just believe this fellow when he says they 'didn't do it'?

The court will forgive me for getting personal, but I consider this motion for sanctions to be a very personal attack on my character, my ability to discern truth from falsehood, my intelligence, my common sense, and my integrity, and so I will share with the Court, and opposing counsel, what type of character I see myself as.

I am a 50 year old husband and father of three, and grandfather of one (all of whom live under my roof), raised first in the Projects of East New York and then in a working class Sicilian/Irish neighborhood as the only Puerto Rican kid (and so I learned to fight at a very tender age, but eventually won my neighbors over to the point where I didn't have to fight them anymore

and became high school class president, and homecoming king – I still hold my trophy dear, to the chagrin of my wife and children).  I am a graduate of both Harvard College and Harvard Law School who has gotten around quite a bit, and has seen quite a bit. I have been a lawyer in Tokyo and New York.  However, I also owned a nightclub in Bolivia frequented by both the DEA and the Cocaine dealers, the Bolivian separatists as well as the Bolivian generals, the models, the politicians, and the Mafioso transplants from Italy.  Someone with such an astonishing lack of discernment as Linda Goldstein seems to consider me to have would not have lasted very long in that particular atmosphere.

I once saved the grandson of the leader of the separatists from getting killed by an extremely dangerous, drunk, general by using only my charm and wit.  I saved an employee of mine marked for death by the Italian mafia with that same charm and wit.  I used to date the niece of Roberto Suárez Goméz, the so-called Bolivian 'King of Cocaine' and the inspiration for the character Sosa from the movie 'Scarface' – he had been Pablo Escobar's partner in Bolivia and founded the Narco-dictatorship there in the 1980's - and although I never met that fellow, I met her father, who was his brother, and I think he is the only person I have ever met who has truly frightened me, and he did so with a simple smile. I am to this day frightened when I contemplate that smile, which is unfortunately permanently etched in my memory, as is Linda Goldstein's seemingly good-natured chuckle.

I worked in oil and gas in Bolivia for a number of years and had a dairy farm. After the Bolivian Oil and Gas War, and as I saw that Bolivia had kicked out the DEA and our embassy, nationalized my former company, and was starting to replace us Gringos with Cubans and Venezuelans, I decided to return to the US.  The Bolivian Oil and Gas War was sparked by a project my company and others were pushing to send Bolivian Gas through Chile to California.  I

warned my company not to do it, because I thought it would lead to a civil war and the ultimate nationalization of my company, but blinded by their greed, they mocked me and pushed forward with it anyway.  I left the company, so when that all happened a few months later, I was already out milking my cows, which is what I really enjoy doing.  But I also really enjoy living, so I had to leave Bolivia in a hurry.

I came back to New York, broke, having left all my cows in Bolivia, hung out a shingle, and now represent primarily poor Spanish speaking people, and other people who can't afford more expensive lawyers, or can't convince a lawyer to take their case because there is not enough sure money in it because it is a difficult case, unlike those slip and fall cases that don't require much thinking and have a guaranteed payout.  So, my financial situation is always precarious.  And I would have to believe that Defendants have some inkling of that fact, and that is another reason they have threatened me with a frivolous motion for sanctions.  They reasoned that any reasonable attorney, calculating his self-interest, with a bank account like mine, would have turned tale at the first threat of sanctions.  But I am not reasonable as they define the term, and I have developed a very thick skin.

I have led a different kind of life.  And different kinds of cases come my way.  And I take them because, given what I have experienced in developing countries, where fraud and corruption is out in the open, and abuse of power is out in the open, unlike here where it is not entirely obvious, I understand the cases, and when I believe my clients, I am willing to defend them under very difficult circumstances, when others simply aren't because they don't believe them and aren't willing to take the time to investigate or, more often than not, believe them and are frightened of getting involved in such a difficult (in some cases even dangerous) litigation without a sure chance of a payout. I just haven't always figured out how to prove some of these allegations to be true to

the satisfaction of a Federal court, under conditions in which I am being paid very little or nothing at all, and find myself up against 5 or 6 or more different lawyers, who were all working on their legal craft when I was out of country doing very different things, and are always coming up with different angles in order to thwart me – like the instant motion by Defendants.  I believe Defendants are concerned about this matter, given that tape, etc. and they should be.  They expect that if you award sanctions, I will not be able to pay them and will not be able to continue with this lawsuit. As I write these papers, I have 311 dollars in my wallet, about 13 dollars in the bank, and National Grid just came to my house with a collection notice in the amount of 1587 dollars, so they might just be right about that.

As Ms. Goldstein pointed out, Judge Sweet said my papers to him read like a "Martin Scorsese thriller'.  Firstly, if that particular matter had been a Martin Scorsese thriller, it would have been the most boring Martin Scorsese novel ever written, as it involved a former FOX employee, who signed a non-disparagement contract with FOX and his sexual harassment accuser, and then was immediately outed to the New York Times, although there were two other signatories to the non-disparagement contract (their identities not known to us) who were not outed. I argued that my client had been used as a scape-goat to demonstrate FOX was handling sexual harassment issues properly, while the other two signatories were not outed because they were very important television commentators at FOX.[7]  Secondly, recent revelations in the press, on April 15, 2018, *regarding one of FOX's most significant television commentators and the fact that he and the President of the United States share the same legal counsel, who is under Federal investigation*

---

[7] I think the reference in my papers to what has occurred during my representation of Alphonse 'Buddy' Fletcher in the Dakota case was what Judge Sweet meant.  Yes, that would make for a good Martin Scorcese novel.  But, unfortunately, all what I wrote in that regard did occur.  Opposing counsel in that case gave the judge's son a job at their firm making over 200,000 a year, so my arguments fell on deaf ears.  I am appealing.

*and who he has utilized in a thus far undefined legal matter*, have come close to confirming for me my initial belief that, if Judge Sweet had permitted the case to proceed, revelations regarding at least one of the other unknown signatories to the sexual harassment related non-disparagement agreement would have raised quite few eyebrows, all across the country, and confirmed that my client was scapegoated.

I am pretty confident that I would not be alive today if I was as gullible as Linda Goldstein expects that I should be in order to avoid her request for sanctions, and I am also pretty confident that Mr. Malyarov wouldn't have his position today if he wasn't as willing to say and do almost whatever his important customers like The New York Post tell him to say and do.  He and PressReader are almost completely controlled by The New York Post and the other Defendants, at least insofar as it relates to an insignificant person like Plaintiff Petra Beter.  Granted, if it was an issue arising between The New York Post and The Daily News, Mr. Malyarov might have to navigate the waters a little more carefully, but this is how he responds to me on October 23, 2017 when I sent him another email on October 9, 2017 to complain about the fact that, several days after they told me they had taken down the article, there are still references to it in search engines.

First, he lectures me as to the difference of the meaning in his world of the words 'publisher' and 'digital distributor', when I don't care what word he uses for putting things out there for people to read - as long as he makes it *not* put out there for people to read –

'PressReader is not "continuing to publish defamatory content" about your client. First, PressReader is a digital distributor, not a publisher, of the content on our platform and we make no editorial decisions about the publications that we feature.'

Then he says that my client's request for an apology or retraction will not be 'published' – I wonder why he didn't use the word distributed if that is the only thing Pressreader does – because my client's claim has not yet been proven in court:

'Further, your client's claim has not yet been proven in court. For these reasons, we will not be publishing any retraction on the PressReader platform or providing on apology to your client as requested.'

Of course, if one of the Defendants had requested it they would have immediately done it.

Another example of how closely connected Defendants and PressReader are – when Ms. Goldstein called me on the telephone, I thought nothing of the fact that she was aware of that letter – I didn't remember giving it to her, but it did not initially strike me as odd that she had access to it – it only struck me as highly odd that she would expect me to believe this fellow just because she said I should. However, in preparing these papers, I was forced to look at those letters again and noticed that there was no cc to anyone on the Defendants' side that I could see on the face of the letters or the emails via which the letters arrived to me.  Moreover, the letters are marked clearly at the top left hand side with the words "Without Prejudice", and more significantly, "Confidential".  All I saw was that the letters were sent to me by email at my email address.  I didn't see Linda's email there, yet here she is waving a copy of that letter in my face, calling me a liar since I don't believe he is not a liar.  Company lawyers marking letters with words with legal significance such as "Without Prejudice' and 'Confidential' in response to a potential litigation do not commonly secretly share those letters with other Defendants who might, ultimately, have a conflict of interest with them when fingers start getting pointed during litigation, unless they are very, very close, perhaps even 'controlled' to at least some degree.  Moreover, if I didn't put a reference in the Amended Complaint to those letters, it was not because I was trying to hide the statements in the letters from them, as Defendants seem to suggest, but because I can't put everything in my Complaint.  As it is, I have already been accused by Judge Sweet of drafting 'a labyrinthian prolixity of unrelated and vituperative charges that defy comprehension'.  Thus, my question for Mr. Malyarov at his deposition would be how did Defendants and their attorneys ever

learn of the contents of the PressReader letter if PressReader is such a 'neutral third party'? And his answer I am sure would indicate that, if anyone here has attempted to mislead this Court, it was Defendants' counsel Andrew Levander and Linda Goldstein.

### CONCLUSION

Defendants and their counsel Andrew Levander and Linda Goldstein have violated their duty under Fed. R. Civ. P. 11(b)(1) by making allegations in their Motion for Sanctions that they knew were false when they made them, and by making these allegations solely for the purpose of providing them with a pretense for filing a frivolous Motion for Sanctions solely intended to intimidate and harass Plaintiff and her counsel, which they falsely represented to the Court was for the purpose of ensuring Plaintiff's counsel compliance with his duty under Fed. R. Civ. P. 11(b)(1). That is precisely the type of behavior that Rule 11 is intended to curtail. Accordingly, sanctions are now warranted against both Defendants and their counsel.

Dated:          New York, New York
                April 20, 2018

                                        Respectfully submitted,

                                        THE LAW OFFICE OF J.A.
                                        SANCHEZ-DORTA, P.C.

                                        By:     /s/ J. A. Sanchez
                                                _____
                                                J.A. Sanchez

                                        225 Broadway, Suite 1901
                                        New York, New York 10007
                                        Telephone: (646) 657-5345
                                        Fax: (347) 809-4540
                                        janthonysanchez@post.harvard.edu
                                        Attorneys for Plaintiff Petra Beter